**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **Disability Rights Tennessee,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. _____** |
| | ) | |
| | ) | |
| **Middle Tennessee Detention Center,** | ) | |
| **L.L.C.; Jason Crews,** | ) | |
| **in his capacity as the Executive Director** | ) | |
| **of Middle Tennessee** | ) | |
| **Detention Center;** | ) | |
| **Hollis Residential Treatment Center;** | ) | |
| **Wayne Halfway House, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

# I. Introduction

1. Plaintiff, DRT (DRT), is the organization designated pursuant to the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act), 42 U.S.C. §§ 10801-10827, and the Developmental Disabilities Assistance and Bill of Rights Act (DD Act), 42 U.S.C. §§ 15041-15045, to protect the rights of and advocate for Tennesseans with mental illness and developmental disabilities. DRT's authority under the PAIMI and DD Acts includes the authority to access the records of such individuals in certain circumstances.

2. In accordance with its authority under the PAIMI and DD Acts, in the spring of 2023, DRT requested the records of various youths housed at the Middle Tennessee Detention

1

Center (MTJDC)[1] and Hollis Residential Treatment Center (HRTC), based either on complaints DRT received or because of its finding of probable cause of abuse or neglect derived from its own monitoring of the facilities.

3. "Each youth in question was and/or is in the custody of the Tennessee Department of Children's Services (TDCS) and had either been adjudicated delinquent by the state of Tennessee and placed at MTJDC, which is licensed by TDCS as one of their youth detention centers to house and serve youth committed to TDCS custody as a result of a finding of delinquency under Tenn. Code Ann. § 37-1-137, or they were placed at Hollis Residential Treatment Center, which is licensed by the TDCS as a Residential Child Care Agency/Maternity Home.

4. DRT is empowered to investigate instances of potential abuse and neglect perpetrated by the defendants against the youths in this complaint because the youths are persons with disabilities. Defendant has been appropriately served with a request for records pursuant to DRT's monitoring and investigation authority for access to records and Defendants have not provided the requested records of the youth for DRT to be able to perform their required duty to monitor and investigate under the authorizing statutes and regulations.

5. Despite repeated requests for these youth's records, and repeated conversations with counsel for both MTJDC and HRTC to try to resolve this matter, Defendants have refused to provide the records DRT is authorized to have access to.

6. Defendants' continued refusal to provide DRT with the requested records relating to these youths violates the PAIMI and DD Acts.

---

[1] Middle Tennessee Detention Center is commonly known as Middle Tennessee Juvenile Detention Center and will be referred to as such.

7. Defendants MTJDC and HRTC and their administrators and agents were all state actors during these repeated violations of Federal Statutes. State action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior 'may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Put bluntly Defendants carry out a public function in concert with and in contract with county governments and TDCS, under the regulation of TDCS. Defendants, as State Actors, have deprived DRT of its rights under Federal laws without due process and thus violate the Fourteenth Amendment and 42 U.S.C. § 1983.

8. DRT seeks appropriate declaratory, injunctive, and any other form of relief the court deems appropriate.[2]

## II. Jurisdiction and Venue

9. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331. This Court has authority to grant Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02, and Rules 57, 65, and 13(g) of the Federal Rules of Civil Procedure. This Court has authority to grant attorney's fees under 42 U.S.C. § 1988.

10. Plaintiff's claims are authorized by the PAIMI Act, 42 U.S.C. §§ 10801-10827, and the DD Act, 42 U.S.C. §§ 15041-15045.

11. This action is brought under 42 U.S.C. § 1983 because the Defendants, acting under the color of state law, have deprived Plaintiff of rights secured by federal statutory law and the Constitution of the United States.

---

[2] *See* Mot. for Prelim. Inj. filed concurrently with this complaint.

12. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b) since Defendants are located in this District and the events and omissions that gave rise to the Complaint occurred in this District.

### III. Parties

13. Plaintiff DRT is a non-profit Tennessee corporation. The state of Tennessee has designated DRT as the organization with responsibility to advocate for and protect the rights of individuals with disabilities and to investigate abuse and neglect of individuals with disabilities pursuant to, inter alia, the PAIMI and DD Acts.

14. Defendant MTJDC is licensed by the Tennessee Department of Children's Services as a youth detention facility, located in Maury County and operated by Middle Tennessee Detention Center, L.L.C.

15. Defendant Jason Crews is the Executive Director of both Wayne Halfway House INC., and MTJDC and has held this position at all times during the actions described in this suit. He is sued in his official capacity. Defendant Crews, by law and contract, is responsible for the implementation of the policies, procedures, practices, and customs at MTJDC, as well as ensuring that MTJDC complies with federal and state laws. Finally, Defendant Crews is the registered agent for service of process for MTJDC at106 HERBERT GALLIAN DR, WAYNESBORO, TN 38485-2219 USA

16. Defendant Hollis Residential Treatment Center is a Residential Child Care Agency, licensed by the TDCS, located within Maury County and owned and operated by Wayne Halfway House.

17. Defendant Wayne Halfway House INC, owns and operates Hollis Residential Treatment Center and operates Middle Tennessee Juvenile Detention Center.

4

18. MTJDC is a separate LLC but has an interlocking set of operating officers with Wayne Halfway House, which is a separate corporation.

## IV. Factual Background

### A. Background on Protection and Advocacy Systems

19. As articulated by the Eleventh Circuit in *Alabama Disabilities Advocacy v. J.S. Tarwater Developmental Center*, 97 F.3d 492, 494 (11th Cir. 1996), the DD Act was passed after inhumane and despicable conditions were discovered at New York's Willowbrook State School for persons with developmental disabilities. The purpose of the D[evelopmental] D[isabilities] Assistance and Bill of Rights (DD) Act is to protect the human and civil rights of the vulnerable developmentally disabled. *Id.* …Protection and advocacy systems are empowered to, among other things, "(1) investigate incidents of abuse and neglect of persons with developmental disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons." *Id.* at 494–95; *Pa. Prot. & Advoc., Inc. v. Royer-Greaves Sch. For Blind*, No. CIV. A. 98-3995, 1999 WL 179797, at *1 (E.D. Pa. Mar. 25, 1999).

20. Congress authorized designated P&A systems to protect the rights of and advocate for individuals with developmental disabilities under the DD Act, 42 U.S.C. §§ 15041, 15043(a)(1), individuals with mental illness under the PAIMI Act, 42 U.S.C. §§

10801(b), 10805(a), and individuals with disabilities not otherwise covered by the DD or PAIMI Act under the PAIR Act, 29 U.S.C. §§ 794e(a)(1), 794e(f). [3]

21. DRT is the P&A system designated by the State of Tennessee to protect the rights of and advocate for Tennesseans with disabilities pursuant to the DD, PAIMI, and PAIR Acts (P & A) Acts.

22. "P&A organizations are intended to be independent watchdogs to keep accountable facilities in custody or care of individuals with mental illness. And in furtherance of PAIMI's purposes, Congress provided P&A organizations with two distinct investigatory powers with respect to facilities subject to PAIMI: monitoring-access authority and

---

[3] For purposes of the PAIMI Act, an individual with mental illness is a person "who has a significant mental illness or emotional impairment." 42 U.S.C. § 10802(4). For purposes of the DD Act, an individual with a developmental disability is a person who has a severe, chronic disability that is (a) "attributable to a mental or physical impairment"; (b) manifested before age twenty-two; (c) "is likely to continue indefinitely"; (d) "results in substantial functional limitations in [three] or more of the following" major life activities: self-care, language, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency; and (e) reflects the individual's need for services, supports, or other assistance. 42 U.S.C. § 15002(8). For purposes of the PAIR Act: this section is designed to

> . . . support a system in each State to protect the legal and human rights of individuals with disabilities who . . . (A) need services that are beyond the scope of services authorized to be provided by the client assistance program under section 732 of this title; and (B)(i) are ineligible for protection and advocacy programs under subtitle C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 because the individuals do not have a developmental disability, as defined in section 102 of such Act; and (ii) are ineligible for services under the Protection and Advocacy for Mentally Ill Individuals Act of 1986 (42 U.S.C. 10801 et seq.) because the individuals are not individuals with mental illness, as defined in section 102 of such Act (42 U.S.C. 10802).

29 U.S.C.A. § 794e(a).

> P & A System's are also empowered under 29 U.S.C. § 3004(a)(2) (Assistive Technology for Individuals with Disabilities Act); and 42 U.S.C. § 300d-53(k) (Protection and Advocacy for Traumatic Brain Injury Act).

records-access authority." *Disability Rts. Tex. v. Bishop*, 615 F. Supp. 3d 454, 461–62 (N.D. Tex. 2022).

## I. P & A Monitoring and Investigations

23. A P & A system monitors facilities to ensure compliance with respect to the rights and safety of service recipients.[4] "P & A staff may visit any building, residential unit or facility during regular business hours for informal visits with clients or for observation or monitoring purposes." *Robbins v. Budke*, 739 F. Supp. 1479, 1489 (D.N.M. 1990).

24. DRT monitors and investigates detention and residential treatment facilities for youth because, in its experience, youth with disabilities in these facilities are particularly vulnerable to abuse, neglect, and rights violations, yet they have fewer natural supports in place because they have limited contact with their families and support systems. Many youths are unaware of their rights, and very few are familiar with DRT's role as the P & A Agency. During monitoring visits, DRT observes physical conditions, gathers information from staff, and then speaks privately with residents so they have an opportunity to confidentially discuss concerns about their experiences at the facility.

25. Middle Tennessee Juvenile Detention Center is a Youth Detention Center and Hollis Residential Treatment Center is a Residential Child Care Agency, and both are considered a "facility" for monitoring and investigative purposes under PAIMI.[5]

---

[4] Under 42 U.S.C. § 15043(a)(2)(H) of the Act, the system and all of its authorized agents shall have "unaccompanied access to individuals with developmental disabilities" within a facility "at reasonable times, which at a minimum shall include normal working hours and visiting hours." 45 C.F.R. § 1326.27. The purpose of this authority is to "monitor[] compliance with respect to the rights and safety of individuals with developmental disabilities." 45 C.F.R. § 1326.27(c)(2)(ii).

[5] Facilities include but are not limited to the following: general and psychiatric hospitals, nursing homes, board and care homes, community housing, youth detention facilities, homeless shelters, and jails and prisons, including all general areas as well as special mental health or forensic

7

26. P&A investigations begin in one of two ways: when the P&A receives a complaint of potential abuse or neglect, OR as a result of monitoring, a P&A determines there is probable cause to believe abuse and neglect may have occurred. "The language of this section of the Act is clear, and it contemplates access to records when the [P & A] either receives a complaint regarding an individual resident, or has probable cause to believe that the health or safety of an individual is in serious and immediate jeopardy.'" *Disability Law Center, Inc. v. Reil* 130 F.Supp.2d 294 at 298 (D. Mass. 2001) (quoting *Pennsylvania Protection & Advocacy, Inc. v. Royer–Greaves School for Blind,* 1999 WL 179797, at *8, *10 (E.D.Pa.1999)).

27. Besides monitoring facilities, P & A systems rely on complaints from the public, family members, and individuals themselves to open investigations and access records. Courts have found that something as simple as an anonymous telephone message alleging abuse at a facility constituted a valid "complaint" justifying access to records under the records access provisions of the Act. The court found that to require the complaints to divulge their names or reduce allegations to writing and sworn testimony or make charges of a particular nature would dilute the Act and too narrowly construe the complaint requirement. *See Ala. Disabilities Advoc. Program*, 894 F. Supp at 498.

28. Even a news article or segment aired on television "can be viewed as the equivalent of a complaint when they provide details about a specific incident of abuse or neglect. While such reports are not specifically directed at the P&A system, they are published with the expectation that public officials responsible for conditions will act to stop abuse. P&A

---

units. Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548-01, 53549 (Oct. 15, 1997) (to be codified at 42 C.F.R. pt. 51).

systems have that role."[6]

29. Through information disclosed during a facility monitoring, P & A systems may determine that there is probable cause that abuse or neglect has occurred and open an investigation.[7]

30. "It is well-settled that a protection and advocacy system is the 'final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that may have been subject to abuse or neglect.'" *Ohio Legal Rts. Serv. v. Buckeye Ranch, Inc.*, 365 F. Supp. 2d 877, 887 (S.D. Ohio 2005).[8]

Examples of abuse or neglect which are routinely investigated by P & A systems because of complaints or probable cause based on monitoring include but are not limited to; the illegal use of restraints (chemical, physical, mechanical), inadequate clothing, lack of medical attention, denial of communication rights, inappropriate medication, lack of

---

[6] Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548-01 (Oct. 15, 1997) (to be codified at 42 C.F.R. pt. 51).

[7] Under the DD Act, "probable cause" means "a reasonable ground for belief that an individual with developmental disability(ies) has been, or may be, subject to abuse or neglect, or that the health or safety of the individual is in serious and immediate jeopardy." 45 C.F.R. § 1326.19. Under the PAIMI Act, "[p]robable cause means reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect." 42 C.F.R. § 51.2. Under both the DD Act and the PAIMI Act, "The individual making [the probable cause] determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect." 45 C.F.R. § 1326.19; 42 C.F.R. § 51.2.

[8] P & A systems need not rely on any other agency to make probable cause determination that an individual with mental illness was subjected to abuse or neglect in support of agency's right to access individual's records pursuant to Protection and Advocacy for Mentally Ill Individuals Act (PAMII), and such determination of probable cause cannot be reevaluated by state or service provider merely because state or service provider disagrees that probable cause exists. 42 U.S.C.A. § 10805(a)(4)(B)(iii); 42 C.F.R. § 51.2.

9

mental health treatment, lack of education, lack of appropriate nutrition, and lack of

protection from unsafe environment (beatings from fellow residents or staff).[9]

31. Once an investigation into alleged abuse or neglect against a person with a mental illness

and/or developmental disabilities has been opened, either through a complaint or a

determination that probable cause exists, P & A systems have the right to access the

records of that individual. 42 U.S.C. §§ 10805(a)(4), 15043(a)(2)(1).

## II. P&A Access to Records

32. "[T]he statutory text and the cases interpreting Section 10805(a)(4) confirm that 'the

statutory phrase 'all records of ... any individual' is quite broad.' Neither the phrase 'of

any individual' nor the statutory definition requires 'records' to be limited to those

exclusively produced as part of the care, treatment, or investigation into the abuse or

neglect of a particular individual." *Bishop*, 615 F. Supp. 3d at 465 (citations omitted).[10]

---

[9] The P&A Acts define "abuse" to include, inter alia, actions or failures to act by employees of facilities that provide care and treatment which causes or may cause injury to an individual with mental illness, including inappropriate use of restraints. 42 C.F.R. § 51.2; 45 C.F.R. § 1326.19. The P&A Acts define "neglect" to encompass, inter alia, acts or omissions by a person responsible for providing services, supports, or other assistance to a person with a covered disability which caused or may cause injury to such a person. Neglect includes the failure to establish or implement an appropriate program or treatment plan, including a discharge plan, failure to provide a safe environment, and failure to maintain adequate and appropriately trained staff. 42 C.F.R. § 51.2; 45 C.F.R. § 1326.19.

[10] Under 42 U.S.C.A §§ 143(a)(2), (A)(i), (B), (I), and (J), P&A systems must have access to individual records, "whether written or in another medium, draft, preliminary or final, including handwritten notes, electronic files, photographs or video or audiotape records." 45 C.F.R. § 1326.25 (b). These individual records shall include, but shall not be limited to:

> Individual records prepared or received in the course of providing intake, assessment, evaluation, education, training, and other services; supports or assistance, including medical records, financial records, and monitoring and other reports prepared or received by a service provider. This includes records stored or maintained at sites other than that of the service provider, as well as records that were not prepared by the service provider, but received by the service provider from other service providers.

33. P & A systems are entitled to such records within 3 days after a written request or 24 hours if the system determines the individual is in jeopardy. This requirement also needs consent from the individual's guardian and applies to cases that fall under the DD Act. The PAIMI statutes do not state an exact time frame but require consent from the individual's guardian and that the records are provided "promptly." 42 U.S.C. § 15043(a)(2)(J); 45 C.F.R. § 1326.25; 42 C.F.R. § 51.41(a).

34. If a P&A system's access is denied or delayed beyond the deadlines specified in § 1326.25, the P&A system shall be provided, within one business day after the expiration of such deadline, with a written statement of reasons for the denial or delay. In the case of a denial for alleged lack of authorization, the name, address, and telephone number of individuals with developmental disabilities and legal guardians, conservators, or other legal representative will be included in the aforementioned response. All of the above information shall be provided *whether or not* the P&A has probable cause to suspect abuse or neglect or has received a complaint. 45 C.F.R. § 1326.26; 42 C.F.R. § 51.43.

35. "By conditioning access on the consent of an individual or, if the individual cannot consent his or her legal guardian or representative, the Acts require that P & A systems contact the guardians of individuals with disabilities or mental illness if they have the requisite prior cause to believe that abuse or neglect is occurring at the facility. This interpretation is consistent with Congress's view that "family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors." 42 U.S.C. § 10801(a)(2). "Hence, we

---

45 C.F.R. § 1326.25(b)(1); *see also* 42 U.S.C.A. § 10806 (3)(a) (defining "records" as including reports by an agency charged with investigating abuse, neglect, and injury at such facility).

conclude that [P & A System] is authorized under PAIMI, the DD Act and PAIR to obtain the names of . . . students and contact information for their parents or guardians." *Conn. Off. of Prot. & Advoc. For Pers. With Disabilities v. Hartford Bd. of Educ.,* 464 F.3d 229, 244–45 (2d Cir. 2006).

36. "A P&A system shall be permitted to inspect and copy records, subject to a reasonable charge to offset duplicating costs." 42 C.F.R. § 51.41(e); 45 C.F.R. § 1326.25(d).

37. "…these regulations do authorize the P&A system to have access to the actual records and to make copies; simply allowing a system to "view" or "inspect" records is not sufficient." Substance Abuse and Mental Health Services Administration; Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness; Final Rule, 62 Fed. Reg. 53548-01, 53560 (Oct. 15, 1997) (to be codified at 42 C.F.R. pt. 51).

### B. Factual Background of Individual Youths

#### I. Facts Regarding Youth S.H.[11]

38. On March 15 and 16, 2023, Plaintiff DRT did a monitoring visit of MTJDC and visited with various youths.

39. Several youth disclosed that a youth had been in room 168 for days and had also been chemically restrained through the use of pepper spray. His name is S.H., and investigators were able to speak with him during the visit.

---

[11] The persons with disabilities for whom DRT seeks records will be referred to by their initials pursuant to the confidentiality requirements of the DD Act. *See* 45 C.F.R. § 1326.28.

40. S.H. disclosed that he had barely left the isolation cell in the month that he had been at MTJDC and that he had been chemically restrained through the use of pepper spray once for flooding his cell. See Exhibit A.

41. He also disclosed that he takes medication for ADHD but that he had not been given it since his arrival at MTJDC. See Exhibit A.

42. Based on the above information, DRT determined it had probable cause to open an investigation for abuse (the chemical spray and isolation) and neglect (lack of medication).

43. S.H. had given DRT his birthdate and his mother's contact information, but when DRT attempted to use that information, it could not contact her to sign a release.

44. On March 17, Plaintiff DRT submitted a request to Defendant MTJDC for the preservation of all records, logs, and videos relating to S. H. be preserved. See Exhibit B.

45. DRT contacted MTJDC asking for the correct contact information for S.H. on May 4th, 2023. MTJDC, through attorney Helen Rogers, responded that, "I think this question may be most appropriately posed to the Department since they would have legal custody of the youth. However, if you think the information is best provided by us, please just let me know your reasoning and I'll evaluate." See Exhibit C.

46. DRT had reached out to DCS regarding S.H.'s parental information but they could find no one in their records with his name and date of birth, leading DRT to believe that they had inaccurate information from the boy.

47. DRT Attorney Sherry Wilds sent an email on June 15, 2023 to Ms. Rodgers, outlining MTJDC's requirement under 45 C.F.R. § 1326.26, 45 C.F.R. § 1386.22(i), and 42 C.F.R. § 51.43, to provide DRT with S.H.'s guardian's contact information asking MTJDC to

"Please provide name, correct DOB, and parent contact information as well as any correction to spelling that may occur. We are requesting that you make a good faith effort to help us locate this information."[12] See Ex. D.

48. On June 30, 2023, Plaintiff DRT's Attorney Sherry Wilds provided Defendant MTJDC's Attorney Matt Sexton with information regarding its federal and state access authority via a phone call, and explained requirements that they provide names, date of birth, and contact information for residents, and specifically for S. H., even if the spelling is incorrect. Sexton said he would get back to her by July 7th, 2023. See Exhibit E.

49. As of the date of this complaint, MTJDC has not given DRT the parental contact information for S.H. as required by law, delaying DRT's access authority, and impeding its federal mandate to investigate abuse and neglect under the P & A Acts.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|

[12] In the sent email DRT also sent the following case law that is directly applicable to the situation.
"We find persuasive the agencies' view that Congress intended a P & A system to be able to obtain the names and contact information for the parents or guardians of students at the Academy. By conditioning access on the consent of an individual or, if the individual cannot consent, his or her legal guardian or representative, the Acts require that P & A systems contact the guardians of individuals with disabilities or mental illness if they have the requisite prior cause to believe that abuse or neglect is occurring at the facility." Connecticut Off. of Prot. & Advoc. For Persons With Disabilities v. Hartford Bd. of Educ., 464 F.3d 229, 244–45 (2d Cir. 2006)
"However, the foregoing authority establishes that a P & A shall have access to records if it receives a complaint or has probable cause in order for certain information to be made available to a P & A.Plaintiff is thus entitled to obtain  the names and addresses of legal guardians, conservators, and legal representatives from Defendants so that it may conduct its investigation." Hawaii Disability Rts. Ctr. v. Cheung, No. 06-00605 DAELEK, 2007 WL 2106584, at *5 (D. Haw. July 13, 2007)

14

| 5/4/2023 | Parents' contact info and proper spelling of name | Never | None | 6/15/2023 6/30/2023 | DRT has not received anything from MTDJC |
|---|---|---|---|---|---|

## II.    Facts regarding Youth C.P.

50. A week prior to DRT's monitoring of MTJDC on March 15 and 16, DRT had received a complaint from C.P.'s grandmother stating that he was not receiving treatment for his bi-polar diagnosis at MTJDC. Based on this complaint, DRT opened an investigation as C.P. has a mental illness and had been potentially subject to medical neglect for that illness.

51. DRT investigators met with C.P. on March 15 at MTJDC, and he told them that he had been chemically restrained with pepper spray for breaking a television in his room.

52. On March 17, Plaintiff DRT submitted a request to Defendant MTJDC for the preservation of all records, logs, and videos relating to C.P.  See Ex. B.

53. DRT requested records from MTJDC on March 23, 2023, after it received signed and executed ROI's from C.P.'s grandmother, asking that the records be sent to DRT by March 27, 2023. See Ex. F.

54. Helen Rodgers responded that same day that, "This has been received. Please note records will not be produced by the 27th as I have a pre-scheduled vacation which begins this afternoon. We'll produce as soon as we're able." See Ex. F.

55. DRT did not receive any materials from MTJDC. DRT sent another request on April 20th, 2023 with an updated ROI signed by the youth's mother when DCS informed DRT that grandmother was not the legal guardian. See Ex. F.

15

56. Helen Rodgers of MTJDC did not respond until April 27th, asking for clarification on why the new ROI's were sent and once that was explained she responded on April 28th stating that, "It will likely be Monday before those specific records are produced." See Ex. G.

57. DRT did not receive any records until May 15th, 2023, 26 business days later instead of the required 3 after DRT provided MTJDC with accurate ROI's on April 20th. The records DRT received were incomplete and were missing various incident reports and video footage of C.P. being chemically restrained with pepper spray. See Ex. J.

58. DRT had arranged to see the video on May 18, 2023, but MTJDC rescheduled that meeting until May 31, despite DRT requesting a copy of the video itself.

59. On May 30, DRT received additional records from MTJDC, but incident reports were still missing.

60. On May 31, 2023, DRT investigators Brittany Beasley and Eric Allman viewed the video footage of C.P. being chemically restrained through the use of pepper spray by MTJDC staff in person with staff from MTJDC. DRT had brought a USB drive on which to save the video but was told by MTJDC attorney Matt Sexton that he had been directed by his client to not allow them to make a copy of it. See Ex. A and Ex. H.

61. As of the filing of this complaint, DRT still has not received all of C. P.'s records or a copy of the footage, both of which were requested pursuant to access authority, and the Defendants are in violation of the P & A Acts for their continued refusal to provide these records.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|

| 4/20/2023 | All | 5/16/2023 5/30/2023 | medical | | Copy of Video of Chemical Spray Restraint Incident Reports |
| --- | --- | --- | --- | --- | --- |

### III.  Facts regarding Youth E.H.

62. DRT investigators met E.H. on March 15th at MTJDC. E.H. is a youth resident there with a developmental disability and he told DRT that he had been subject to unauthorized use of chemical spray through the use of pepper spray. See Exhibit A.

63. On March 17, Plaintiff DRT submitted a request to Defendant MTJDC for the preservation of all records, logs, and videos relating to E. H. be preserved. See Ex. B.

64. DRT then reached out to E.H.'s guardians and once the proper releases of information were signed and procured, DRT sent MTJDC a records request on April 21, 2023, citing 42 U.S.C. §§ 15043, 10805; 45 C.F.R. § 1326.25(a)(2); 42 C.F.R. § 51.41(b)(2); and 42 U.S.C. § 794e. See Ex. I

65. DRT received some records from MTJDC on April 28th, (five business days instead of the statutorily required three) and staff at both MTJDC and DRT corresponded about a time for DRT to see the video of E.H. being restrained by MTJDC staff. The records DRT received on April 28th were incomplete, containing only medical records, and with no explanation from MTJDC regarding why they were incomplete. See Exhibit K.

66. Additional records were received on May 15th, 2023. See Exhibit J.

67.  Due to rescheduling by MTJDC, DRT investigators were not able to see the video until May 31, at which time they watched it with MTJDC staff present at the facility.

68. When DRT requested to copy the video, bringing a USB device so they could save it, MTJDC declined. MTJDC attorney Matt Sexton said that he had been directed by his client to not allow them to make a copy of it, exactly as they had done with C.P.'s video, which was viewed during the same visit. See Exhibit A and Exhibit H.

69. As of the filing of this complaint DRT still has not received all of E. H.'s records that were requested in violation of the P & A Acts.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|
| 4/21/2023 | All | 4/28/2023 | Medical, Education, Incident Reports | | Copy of Video Footage of Chemical spray Restraint |

## IV.     Facts regarding Youth M.W.

70. DRT investigators met M.W. on March 15th, 2023, while monitoring MTJDC/HRTC and meeting with various random residents for interviews.

71. M.W. is a resident at Hollis Residential Treatment Center (HRTC), which is a girl's treatment facility licensed by the Tennessee Department of Children's Services and located within the MTJDC grounds. See Ex. H.

72. On that date, M.W. disclosed that she had been chemically restrained with pepper spray by staff in the recent past at HRTC for talking loudly across the pod. See Exhibit H.

73. M.W. stated that after being restrained she took her clothes off as they were burning from the chemicals and that she was restrained again while naked. See Exhibit H.

18

74. Due to M.W.'s placement in a residential treatment facility and having chemically pepper sprayed, DRT opened an investigation on her behalf.

75. After securing the proper ROI's, DRT requested M.W.'s records citing 42 U.S.C. §§ 15043, 10805; 45 C.F.R. § 1326.25(a)(2); 42 C.F.R. § 51.41(b)(2); and 42 U.S.C. § 794e. See Exhibit L.

76. DRT's records request was not properly fulfilled. While DRT did receive some requested records from HRTC within the required three days, the records received were incomplete.

77. Within the received records there is an email stating that youth was physically restrained on 9/16/2023. There are nurses notes from 9/28/2023 stating her eyes are blurry, another from 9/29/2022 that states youth was suffering from trouble seeing and the Nurse's assessment was that this was due to "chemical spray reaction." The next day there is a note regarding a bruise on M.W.'s hip. There is no information regarding these incidents anywhere else in the records DRT has received. See Exhibit M.

78. DRT still has not received incident reports and video footage from the alleged incident. Unlike the case with C.P. and E.H., DRT has not been able to view any footage concerning M.W.

79. As of the filing of this complaint DRT still has not received all of M.W.'s records or a copy of the footage, in violation of the P & A Acts.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|
| 5/11/2023 | All | 5/16/2023 Facility told DRT additional records were forthcoming. Never arrived. | Medical and Medication records | 6/15/2023 6/30/2023 | Education Records Incident Report for Chemical spray Restraint |

| | | | | | Video Footage |
|---|---|---|---|---|---|
| | | | | | |

## V.      Facts regarding Youth M.C.

80. On March 3, DRT staff were monitoring Mountain View Academy where one resident, M.C. disclosed that he had been placed in MTJDC in the months before his transfer. See Exhibit A.

81. M.C. disclosed that while at MTJDC he was chemically restrained with the use of pepper spray because his roommate broke the fire sprinkler in their room. See Exhibit A.

82. Since M.C. did not disclose any disability or having an I.E.P., DRT went through DCS and family members to see what documentation was available to determine eligibility for their services.

83. Documents provided by DCS showed that M.C. had an I.E.P. in the past, but not a current one and DCS told DRT that "[s]teps are being taken to expeditiously remedy the oversight. I am not sure how helpful it is to you, but I have included the last IEP we were able to locate for this youth." See Exhibit N.

84. Due to M.C.'s need for an I.E.P[13]., DRT determined that he was eligible for its services and DRT opened an investigation into him being chemically restrained with pepper spray while at MTJDC.

---

[13] A child is only eligible for an Individual Education Plan (IEP) if they have a disability. 20 U.S.C.A. § 1401

85. A records request was sent to MTJDC on May 23, 2023, citing 42 U.S.C. §§ 15043, 10805; 45 C.F.R. § 1326.25(a)(2); 42 C.F.R. § 51.41(b)(2); and 42 U.S.C. § 794e. See Ex. O.

86. Due to disagreement about DRT's access authority, MTJDC denied DRT's request for records. See Ex. P.

87. A clarification letter was sent on June 13, 2023, by DRT Attorney Sherry Wilds to MTJDC attorneys Helen Rodgers and Matt Sexton stating, "Our agency has received a complaint as required and therefore does not have to assert probable cause in this matter. PAIR (Protection & advocacy for Individual Rights Act) defers to PADD regulations above for records access. DRT has met the requirements above by making a good faith effort to contact the parent, guardian, or other legal representative and offering assistance to them. The parent, legal guardian, conservator, or other legal representative has failed to provide consent on behalf of M. C. Therefore, DRT is requesting these records be provided to Eric Allman within 3 business days of this letter. Thank you, Sherry" See Exhibit P.

88. DRT received some records on June 26th from MTJDC, but upon review the records contained only dental and medical records (and incomplete ones at that). MTJDC provided no facility records.

89. DRT reached out to MTJDC again on June 26th by email requesting the full records and again through a phone conversation between Attorney Wilds and Sexton on June 30th, in which Sexton said he would get back to DRT by July 7th. See Exhibit Q and Exhibit E.

90. On July 5th, DRT received some but not all of M.C.'s records.

21

91. On July 6th, DRT Investigator Eric Allman reached out to MTJDC attorneys Rodgers and Sexton via email stating that, "I have reviewed the records for [M.C.] from MTJDC. There were four D-Board reports in the records. One of the D-Board reports came about because he 'popped his sprinkler in his room.' Traditionally a Behavior Reduction Sheet has accompanied these D-Board reports, which indicates the start time, offense, ending time, and reporting staff. The Behavior Reduction Sheets were omitted in the records provided. [M.C.] alleges that he was criminally charged for the incident involving the sprinkler. There were not any reports indicating that law enforcement was called, he was criminally charged, or that he was ever transported to court. We would also like any records of medical treatment that he received while at MTJDC, including by nursing staff at the facility. Please note that the original request was for 'All records including but not limited to.' The original request is attached. Thank you for looking into this matter." See Exhibit R.

92. DRT has received no response from MTJDC.

93. As of the filing of this complaint DRT still has not received all M.C.'s records or a copy of any potential footage of his chemical spray incidents, in violation of the P & A Acts.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|
| 6/13/2023 | All | 6/26/2023 7/5/2023 | Dental and Medical Records | 6/26/2023 6/29/2023 7/6/2023 | Behavior Reduction Sheet Medical treatment records Footage of Chemical Spray Restraint |

22

## VI.    Facts regarding Youth K.S.

94. On April 6th, 2023, DRT investigators were monitoring the Wilder Youth Development Center and were interviewing residents.

95. One resident, K.S. disclosed that he had been subject to chemical pepper spray during his recent time at MTJDC, where he had been placed from December 22, 2022, until his recent transfer to Wilder. See Exhibit S.

96. K.S. disclosed to DRT investigators that he had a history of PTSD, Bi-Polar and anxiety and that he was prescribed Lexapro, Adderall, Prazosin and Guanfacine but that he was not allowed to take Guanfacine while at MTJDC. See Exhibit S.

97. K.S. disclosed that he had been chemically restrained with pepper spray while at MTJDC on three separate occasions: once after a fight, once for pounding on his door and yelling for his inhaler, and another time after his pipes broke and was accused of flooding his cell. See Exhibit S.

98. Based on the medication K.S. stated he was taking, DRT determined that he was a person with a disability  who fell within its federal mandate and decided to open an investigation.

99. Once it received an ROI from his guardian, DRT sent a records request to MTJDC on May 29th, 2023, citing 42 U.S.C. §§ 15043, 10805; 45 C.F.R. § 1326.25(a)(2); 42 C.F.R. § 51.41(b)(2); and 42 U.S.C. § 794e. See Exhibit T.

100.    There was some delay on MTJDC as they questioned if that was really his guardian as her last name had changed since late 2022 when he was admitted. DRT reached out to K.S.'s mother, and she confirmed her name had changed and that the

current one on the ROI was correct. This confirmation took place on May 31, 2023, and was relayed to MTJDC via email immediately. See Exhibit U.

101.     On June 12, 2023, DRT received incomplete records, 10 days after the initial request and 8 days after the guardian name confusion was cleared up, instead of the required 3. These records only included medical and dental, no incident reports or facility records.

102.     After reviewing the records provided by MTJDC, DRT found a nurse's note that stated K.S. had been chemically restrained with pepper spray while at MTJDC on 12/29/2022, however there were no incident reports, narratives, or any mention of this event in any of the other documents. Documents received by the Department of Children's Services stated that there was another incident on 12/31/2022 in which K.S. was chemically restrained with pepper spray while at MTJDC but there is no mention of it in any of the documents provided by MTJDC. See Exhibit V and Exhibit W.

103.     On October 5th, 2023, DRT Attorney Jeremiah Jones reasserted its request for all of K.S. records by sending a letter to Helen Rodgers, Matt Sexton, and Tom Irwin. This letter included direct requests for records concerning the 12/29 and 12/31 incidents of chemical restraint by pepper spray. See Exhibit X.

104.     Attorney Jones never received a response in any way from MTJDC.

105.     As of the filing of this complaint DRT still has not received all K.S.'s records or a copy of any video footage of his chemical spray incidents, in violation of the P & A Acts.

| Date Records Requested | Records/Info Requested | Date of Records Received | Records Received | Additional Request Dates | Outstanding Requested Records/Info |
|---|---|---|---|---|---|

24

| | | | | | Incident reports/footage of spray incidents on 12/29/2022 and 12/31/2022 |
|---|---|---|---|---|---|
| 5/29/2023 | All | 6/12/2023 | Medical and Education Records | 10/5/2023 | |

## IV. CAUSE OF ACTION – VIOLATION OF THE PAIMI and PADD ACTS

106.     DRT restates and incorporates by reference each of the allegations contained in Paragraphs 1 through 105 above.

107.     DRT, as Tennessee's designated P&A System, has the authority to access records of programs serving people with disabilities and the confidential records of people with disabilities. *See* 42 U.S.C. §§ 10801-10827; 42 C.F.R. § 51.41; 42 U.S.C. § 15043(a)(2)(I)-(J), (c); 45 C.F.R. § 1326.25(b).

108.     Defendants' failure to permit DRT access to various youth's records violates the PAIMI and PADD Act.

109.     Defendant has violated these Federal Acts while acting as a State Actor under 42 U.S.C. § 1983.

110.     DRT has no adequate remedy at law and will be irreparably harmed if the Defendants are permitted to continue to deny it access to these youth's records. Defendants' actions impede DRT's investigation into the allegations and concerns that MTJDC, HRTC, and their agents are or have abused and neglected these individuals and, thus, they and similarly situated youths may be in serious and immediate jeopardy.

## V. INJUNCTIVE & DECLARATORY RELIEF

111.     DRT restates and incorporates by reference each of the allegations contained in Paragraphs 1 through 110 above.

112.     The policies, procedures, regulations, practices, and customs of Defendants violated and continue to violate the rights of DRT under the PAIMI and PADD Acts to full, complete, meaningful, and timely access to these youth's records. These policies, procedures, regulations, and practices will continue to violate DRT's right to access these records presently and, in the future, unless Defendants are ordered to comply with the P & A Acts.

113.     Plaintiff DRT requests this Court enter a declaratory judgment that Defendants' policies, procedures, regulations, and practices continue to deny DRT full, complete, meaningful, and timely access to requested records of these youths violated and continues to violate the PAIMI and PADD Acts.

114.     Plaintiff DRT requests that the Court enter preliminary and permanent injunctions enjoining Defendants from continuing to deny full, complete, meaningful, and timely access by Plaintiff DRT to these records.

115.     In support of its request for a preliminary injunction Plaintiff DRT has concurrently filed a Motion for Preliminary Injunction, a Memorandum of Law in Support of Motion, and a Proposed Order, with this complaint,

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Disability Rights Tennessee respectfully prays that this Court:

1. Enter a declaratory judgment that Defendants have violated Plaintiff's rights under the PAIMI and PADD Act by:

   i.   Denying DRT access to listed youth's records for whom release of records is authorized by federal law;

26

    ii.   Interfering with DRT's duty to investigate allegations of abuse and neglect of persons with disabilities, namely the listed youths; and

    iii.   That Defendants' policies, procedures, regulations, and practices of denying DRT access to these youths' records violate the PAIMI Act (42 U.S.C. §§ 10801-10827) and the PADD Act (42 U.S.C. §§ 15001-15009).

2.   Grant preliminary and permanent injunctive relief that enjoins Defendants, their agents, and employees from denying DRT access to these youth's records and other records of individuals with disabilities served by MTJDC and HRTC;

3.   Maintain jurisdiction over this action until Defendants comply with the PAIMI and PADD Acts as demanded;

4.   Award Plaintiffs their attorneys' fees and costs of this action as authorized by 42 U.S.C. §§ 1983 and 1988.

5.   Award such other and further relief, at law or equity, to which Plaintiff DRT is justly entitled.

Respectfully submitted,

December 22, 2023

Disability Rights Tennessee, Inc.



_____
Jeremiah Jones, (BPR #040551)
Disability Rights Tennessee
9050 Executive Park Drive, Suite B-101
Knoxville, TN 37923 (865) 670-2944

27

jeremiahj@disabilityrightstn.org

Jack W. Derryberry, Jr. (TN Bar# 003870)
Sherry Ann Wilds (TN Bar # 021756)
2 International Plaza, Suite 825
Nashville, TN 37217
(615) 298-1080
jackd@disabilityrightstn.org
sherry@disabilityrightstn.org

## Certificate of Service

DRT has reached out to attorney for defendants to see if they will waive service. DRT will update and file the proper paperwork once it knows what form service will be.

*/s/ Jeremiah Jones*